### BRAZEL v. FAIR.

1. A creditor cannot bring an action for the recovery of lands of his deceased debtor, for the benefit of himself and other creditors of the estate. But he may sue the administrator to judgment and then subject the land, in equity, to the payment of the debts of the deceased.
2. Where the attorney who drew a deed is made a witness to its execution, he is not privileged from testifying, at least to the consideration.
3. From the evidence in this case, the court concludes that a trustee had used trust funds to erect improvements on his own land, and with trust property had reproduced, in part, the buildings thereon after their destruction by a fire.
4. Where property is purchased with trust funds, a trust attaches to it, and the *cestuis que trust* have the option to take it. And where a trustee uses trust funds to erect buildings on a lot of land held by him in fee, and thus mixes the trust property with his own, the *cestuis que trust* are entitled to follow the property for the amount of the trust money.
5. A trustee having appropriated in part trust funds to the erection of buildings on his own land, made a declaration under hand and seal, whereby he undertook to substitute this improved property for the trust funds in discharge of his liability therefor. *Held*, that this substitution was unauthorized, but the *cestuis que trust* might elect to confirm it, and claim the property as their own.
6. Two trustees, A and B, jointly holding property in trust for Mrs. A and Mrs. B, who were sisters, with remainder to their children, or, in default thereof, to the survivor or her children, made a division under a power contained in the trust deed. A used the trust cash in his hands in erecting buildings on a lot of land held by him individually, and then undertook by deed to substitute this entire property for the money so used by him, and for a bond given to him by B for equality of partition. B died and his widow became his executrix. A, joined by his wife (who was childless), then filed a bill against Mrs. B and her infant children, to have a mistake in said bond corrected, and the amount thereof paid to A in his own right, and the lot of land (the buildings then being in ruins) declared to be the trust estate. The court corrected the mistake, declined to order payment of

the bond, and refused to confirm the substitution of the property, say-
ing the deed was voidable—that Mrs. A, being a married woman, was
incapable of consenting, and her sister objects; but the court had no
information as to the solvency of A and ordered no inquiry upon this
point. A and Mrs. B died, after which Mrs. A kept possession of the
property, she and the children (now adults) of her sister treating it as
their own. *Held*, that this decree did not adjudge that the *cestuis que
trust* could not claim this lot of land as trust property, nor did it make
any election for them, and therefore Mrs. A and the children of Mrs.
B were afterwards entitled to elect to hold it as their own against the
individual creditors of A.

Before FRASER, J., Richland, April, 1886.

A statement of this case is made in the opinion of this court.
The deed of partition is there sufficiently stated. The declaration
of trust, after reciting the DeBruhl deed and the deed of parti-
tion, proceeded as follows:

And whereas, I, the said Samuel Fair, am possessed and seized
as of fee of a certain lot of land, with a brick tenement building
thereon, situated in the said city of Columbia, commonly known
as Fair Row, containing eight tenement houses or residences,
most advantageously located in the said town, entire for sale or
rent; which property it is deemed advisable for the use and bene-
fit of the said Mary D. Fair, and the parties under the limitations
of the said deed, should be substituted and held in trust by me in
lieu and instead of the said trust fund of $42,500.00, the said
funds being hereby discharged in my hands of the trusts and limi-
tations of the said deed.

*Now know ye*, that I, the said Samuel Fair, in consideration of
the premises and by virtue of the power in me vested, do hereby
acknowledge, testify, and declare that the said lot of land and
tenement building thereon, with the appurtenances, situate, lying,
and being in the city of Columbia, in the State aforesaid, bound-
ing to the south on Plain street, east on Sumter street, * * * is
held by me, the said Samuel Fair, in trust under the provision of
the said deed of trust as fully and in every respect the same, and
to all intents and purposes as if the said lot of land, with the tene-
ments and out buildings thereon had been originally named and
included in the said deed of trust executed by the said Jesse
DeBruhl for the use and benefit of his daughter, the said Mary
D. Fair, subject to the same conditions, limitations, and powers as
are expressed in the said deed in reference to the other property
therein conveyed. The said deed being hereby declared a part

and parcel of this instrument of writing now made——in the nature of a declaration of trust for the uses and purposes aforesaid, together with all of my estate, rights, titles, and interest in said lot of land and tenements, or any part thereof. And I do hereby bind myself to warrant and defend all and singular the said premises to the uses of the said trust against the lawful demands of all persons whomsoever. In witness whereof, I, the said Samuel Fair, have hereunto set my hand and seal this the 16th day of June, A. D. 1863.

(Signed)　　　　SAMUEL FAIR, [L. S.]

Signed, sealed, in the presence of
　　　　JOS. DANIEL POPE,
　　　　B. F. WATKINS.

The Circuit decree was as follows:

1. The deed of Samuel Fair of June 16, 1863, after reciting the DeBruhl deed, the sale and partition of the property, the ownership by Dr. Fair of the said lot and its value, and "that it is deemed advisable for the use and benefit of the said Mary D. Fair and the parties under the limitations of said deed," that the said lot "should be substituted and held in trust by me in lieu and instead of said trust fund, $42,500, the said trust fund being hereby discharged in my hands of the trusts and limitations of said deed," goes on to declare "that the said lot is held by me, the said Samuel Fair, in trust under the provisions of the said deed of trust as fully and in every respect the same, and to all intents and purposes, as if the said lot of land, with the tenements and buildings thereon, had been originally named and included in said deed of trust."

There is nothing in this deed to show that Dr. Fair claimed that any portion of the trust fund was expended in the erection of the valuable buildings which were on the lot. The deed seems to have been intended only as a change of investment, and to have for its purpose and scope the substitution of this lot with the valuable buildings then on it for the *whole* of the trust fund then held by Dr. Fair, including the Bauskett bonds, the money due by himself and by the co-trustee, Col. Marshall. Though this investment was made by only one trustee, he was the only one then living; and if the purchase had been made from some third person and in good faith as an investment, I see no reason why, under the power in the deed, the investment should not have

been a good one, even without or against the consent of the bene-
ficiaries of the trust.    Dr. Fair, however, had no right to buy
from himself for the trust estate with the trust funds, and the
question of the validity of the investment remained an open one
until 1866 ; and for some reason the deed was never recorded
until after the commencement of this action.

All the valuable buildings on this lot perished during the burn-
ing of Columbia in the spring of 1865, and with the loss of the
buildings there was almost a total loss of value to the lot.    Dr.
Fair then resorted to the chancery powers of the Court of Equity
to confirm this investment, and to have the decree of the court
that this lot should be held as the trust estate, or that the deed by
Dr. Fair of June 16, 1863, should be held and decreed to be a
valid execution of the power to invest conferred by the DeBruhl
deed.    For this purpose a bill was filed by Dr. and Mrs. Fair in
the Court of Equity for Richland District April 11, 1866, against
Mrs. Marshall, as executrix, and Jno. W. Marshall, as executor,
of J. Foster Marshall, and against Mrs. Marshall, as life-tenant,
and her children, all of whom were then living, some of them
being minors.

The case was heard by Chancellor Carroll, and on November
15, 1866, he filed a decree, in which, amongst other things, it is
held that the "declaration of trust executed by Dr. Fair in June,
1863, is held to be unauthorized by the power conferred by the
deed of DeBruhl."    In the light which time has thrown on the
condition of things existing in 1866, showing the insolvency of
the estates of Dr. Fair and Col. Marshall, it is difficult to under-
stand why there was any opposition to the proposed confirmation,
or any demand for the payment of so large a sum of money from
the estate of Col. Marshall, this being one of the purposes of the
bill.    Yet Mrs. Marshall did object, and the court had a right,
and exercised it, of objecting on the part of Mrs. Fair, then a
married woman, and on the part of the minors, all of whom were
properly before the court.    The decree of Chancellor Carroll binds
them in all respects just as though they had been *sui juris*, and
had objected for themselves to the proposed investment.

I am inclined to the opinion that it was not a case for election.
It was a case where the trustee had a right to come into the court

and ask its advice and direction as to the mode of discharging his duty, and the decree of the court would have been binding with or without the consent of the beneficiaries. This decree of Chancellor Carroll not only disapproves of this investment made by the deed of June, 1863, but goes on to hold that the $13,395 due by Col. Marshall was to remain as an investment of so much of the trust estate, the interest on which was to be paid to Mrs. Fair and Dr. Fair for life as income.

This decree was a judgment of the court on a matter properly before it. If the deed of June, 1863, had been approved by that decree, there would be no power now to set it aside; and as it has been held to be an improper investment, I fail to see how the court can now hold it valid, especially when in the decree the court refused to allow Dr. Fair to keep a large part of the consideration—the Marshall debt of $13,395—on which the transfer of his private property to the trust estate was offered by Dr. Fair, to be made in part as the consideration therefor. This proposition would be too plain for argument if Dr. Fair had, as he might have done, invested all these trust funds after this decree, and lost them without fault on his part.

If, after this decree, Dr. Fair had made a new deed on the same trusts and limitations, and for the many reasons now apparent, the court or the parties might now accept it; but I do not see how the court can now give vitality to a deed once refused by the parties, or some of them, and disapproved by the court. Dr. Fair did not make any new declaration of trust, but, on the contrary, he treated this property as his own, and proceeded to borrow money for the purpose of improving it, and gave his own bond to Mr. McCarter with a mortgage of this lot as security—executing the mortgage as of his own property. It is true that Mrs. Fair joins in the mortgage and renounces her dower, but the mortgage contains no reference to the trust estate; and if there had been any purpose to admit the trust in any way, it would have been much more to the purpose to have joined also the children of Mrs. Marshall, who were the remaindermen in fee, while Mrs. Fair was only a life-tenant. In this mortgage the mortgaged lot is described as bounded on one side by an "unencumbered lot belonging to the said Samuel Fair (originally a part of the same

premises)." On an examination of the papers before me, I have come to the conclusion that this unimproved lot, therein claimed as his own by Dr. Fair, is a part of the lot covered by the deed of June, 1863. For these reasons I have come to the conclusion that defendants cannot rest on the deed of June, 1863.

2. The defendants, however, rely also on the second ground— that a large part of the money of the trust estate, derived from the Bauskett bonds, some $20,000 or $24,000, was used by Dr. Fair in erecting the tenement buildings, using the same with a similar amount from his own funds for the purpose. There is considerable dispute about the facts on which this claim rests. The buildings on Fair's Row were put up some time between 1853 and 1856. At least one-half of the Bauskett debt was not due until after this date. There is no direct proof that any part of these bonds was paid him to 1856, or that there was any sale made of them by Dr. Fair so as to realize any money on them. The only evidence going to show that any part of this debt was collected, shows that one of the bonds had passed into the hands of a third party.

The testimony relied on to show that any part of this trust money was used on this lot is that of Mrs. Fair and of Mr. Pope, who was the confidential adviser of Dr. Fair, and was also a witness to the deed of June, 1863. The testimony of Mrs. Fair does not seem to come within the exceptions in section 400 of the Code. I think that so far as Mr. Pope's testimony as to confidential communications between himself as an attorney and Dr. Fair as his client goes to show a consideration for the deed of June, 1863, it is competent, because he is a witness to the deed, and the rule cannot be extended to such a case, because the counsel is made a witness, and the door has been opened by the client himself. So far, however, as the testimony goes to show that Dr. Fair made confidential statements to his counsel, which would create a charge on his individual estate in favor of the *cestuis que trust,* or any other persons, by reason of any violation of his duty as trustee, by an unauthorized use of the trust fund, I think it is in-competent. It does not make the testimony competent, that it is given in favor of the widow, because it is given to establish an

interest adverse to her as widow and devisee and as beneficiary of a trust.

If, however, we assume the testimony of both to be competent, there is great want of definiteness in the statements. These statements seem to me to be entirely consistent with the view that Dr. Fair, in some way, perhaps by sale, realized some $20,000 or $24,000 on the Bauskett bonds, and used it in common with his own funds for all purposes, but that in fact he expended on Fair's Row that sum of money, more than he had on his own individual accounts, and in one sense he may have expended that amount out of the trust fund on these buildings, and yet, in fact, not one dollar of the money from that source may have been so used. This seems to be the view of the case on which the bill in equity was founded, and in which he treats this money as still in his hands, and for which he had proposed to substitute the lot and buildings.

If, however, we assume that this amount of the trust estate was used in these buildings, it cannot be "distinguished from his own." *McNeil* v. *Morrow, Rich. Eq. Cas.*, 175. The right to follow trust funds "ceases only when the means of ascertainment fail ; which, of course, is the case where the *subject-matter is turned into money* and mixed and confounded in the general mass of property of the same description." *Story Eq.*, § 1259. If this amount of money was realized on the Bauskett bonds, and Dr. Fair, during the construction of these buildings, expended some $20,000 of his own money on the buildings, and lived on a scale of expenditure which allowed as much as "$2,000 or $3,000 every summer for eight consecutive summers" on his wife in travelling, it is very hard to say that in fact any portion of the trust money in his hands was expended on the buildings, and that he did not use that money for other purposes and intend to replace it with his own, and with the best motives, and in a way to which there could have been no objection if misfortunes had not come upon him in the common financial ruin which came upon the South in 1865.

If this had been the state of facts, there might have been a breach of trust which would have made Dr. Fair personally liable, but not a constructive trust in the lot itself, even to the

extent to which he had made himself liable by using the trust funds in this way. I have not been able to find any case in which it is held that the use of trust funds in improvements operates to create a constructive trust in the land itself, or a lien upon it in favor of the trust estate. *It is the lot itself that is here claimed, and not a lien upon it.*

If, however, there had ever been any just claim of title to this lot, or to a lien upon it, in favor of the trust estate, that question cannot now be raised. When Dr. Fair and Mrs. Fair filed their bill against Mrs. Marshall and others in 1866, and on which Chancellor Carroll made his decree, the very claim was made that is now before the court, that this lot was trust estate. The only difference is, that the defendants in that case now make the claim, and rest upon an additional ground, relying not only on the deed of June, 1863, but on a constructive trust arising from the improper use of trust funds.

In *Cromwell* v. *The County of Sac* (94 *U. S.*, 352) it is said that a judgment is "a finality as to the claim or demand in controversy concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to *any other admissible matter* which might have been offered for the purpose." In 2 *Smith Lead. Cas.*, 681, it is said that "a man who obtains or defeats a judgment by representing a transaction in one aspect will be precluded from giving it a different and inconsistent character in a subsequent suit founded on the same subject-matter."

Chancellor Carroll held that this lot was not trust property, and on the ground that there was no valid execution of a power. But I cannot see that it ought to affect that judgment if at the time there was another ground on which it could have been held that it was trust property, in whole or in part. Parties who come into court to claim or defend their rights to property must bring with them all their facts and all their reasons, and not keep back some of them for a second hearing. I therefore hold that this claim has been concluded by the decree of Chancellor Carroll.

There is, however, one other view of this case which seems to me to be conclusive. The building into which this trust fund is

alleged to have been put was destroyed by fire in 1865, and nothing has been left but the lot and the broken brick, a long way in value less than the amount of Dr. Fair's own money used in the building, and as to the amount of which there seems to be very little dispute. The valuable house now on the lot was erected by Dr. Fair out of his own means and with these ruins in part, and there is no pretence that any of the trust money was thus used in the buildings. The lot in its present condition is worth about $8,000, a large part of which may be due to the buildings now on it.

3. In order to make the possession of an heir or devisee adverse to creditors of the deceased, there should be something in such possession which amounts to an *ouster*. The only thing relied on in this case is the fact that Mrs. Fair filed her complaint June 27, 1871, against the creditors of Dr. Fair to marshal the assets of his estate, alleged in the complaint to be insolvent. In this complaint it is alleged that Dr. Fair's estate consists of certain personal property, "together with certain real estate lying in the city of Columbia, consisting *chiefly* of two squares or lots of land." The lot in dispute in this case is not one of them. So far from being a denial that there is other real estate, this is an admission that there is such other estate. If there had been a distinct denial that there was other real estate, this would have only been one of the issues raised in that case and still undecided, and the statute can only run as to any matter included in such issues until the commencement of that action. If the issue as to the title was not raised by that complaint, it is difficult to see how the fact that it was filed can in any way be held an assertion by Mrs. Fair of an adverse title.

If in any way the statute had commenced, it was suspended by the injunction order in that case of July 20, 1871, by which the creditors were "enjoined from proceeding against Mrs. Fair, the plaintiff in this action, and the executrix of the will of the said Samuel Fair, deceased." Mrs Fair was devisee and executrix under that will, and such an action as this, brought without leave, would have been in contempt of the court. The other defendants in this case were no parties to that complaint to marshal assets ; they have no actual possession ; and it is not appa-

rent how any title by possession only on the part of Mrs. Fair can in any way inure to their benefit.

There has been no argument before me as to the liability of Mrs. Fair for rents and profits, and that question will be left open, as well as any claim of dower and right to come in as a creditor, if parties should be advised to claim an accounting for the trust estate in the hands of Dr. Fair as trustee.

It is therefore ordered and adjudged, that the lot described in the complaint, and known as Fair's Row, was at the death of Dr. Samuel Fair, and now is, a part of his real estate and liable to the claims of his creditors, and passing to the devisee under his will after the creditors have been paid. It is further ordered, that the said lot be sold on salesday in October next, &c.

The defendants appealed upon exceptions which cover several pages of the Brief, but they substantially involved only the following questions:

1. The validity of an instrument of writing executed by Dr. Fair in 1863 declaring this property to be the estate held by him in trust.

2. Whether a valuable building of eight tenement houses, known as Fair's Row, erected on such lot (then held in fee by Dr. Fair), was erected with money of the said trust estate; and if so, whether the subsequent destruction of Fair's Row by fire, and the erection of the present building, largely with materials and the proceeds of sale of materials from the old, partly with money raised by a mortgage of a part of this lot, and partly, perhaps, with Dr. Fair's own funds, affected the rights of the *cestuis que trust* as against this property.

3. And, as bearing upon this question, whether certain statements made by Dr. Fair to J. D. Pope, Esq., an attorney at law, were privileged communications, and Mr. Pope's testimony as to such statements therefore incompetent.

4. Whether both of the questions first above stated are matters that were raised, or might have been raised, and therefore were adjudicated, and in favor of Dr. Fair's individual estate, and against the claim of the *cestuis que trust*, by an unappealed decree of Chancellor Carroll, filed in November, 1866, in the case of

*Samul Fair and Wife* v. *Eliz. A. Marshall and J. W. W. Marshall, executors,* and others.

5. Whether this plaintiff, a creditor of Dr. Fair since 1867, is estopped by *laches* from now asserting her claim against this property; and as incident thereto whether demand by the plaintiff to have this property subjected to the payment of Dr. Fair's debts, has been prevented by an injunction order of Judge Melton in July, 1871, in the case of *Mary D. Fair, executrix of Samuel Fair,* v. *Jacob Geiger et al.*—this present action having been instituted between April 30, 1885, and July 22, 1885.

6. Whether it is proper that a sale of this property should be made under a decree in *this* case.

*Messrs. Pope & Shand,* for appellants.

*Messrs. William Wallace* and *S. W. Melton,* contra.

April 7, 1887. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. The late Dr. Samuel Fair, of the city of Columbia, died largely insolvent in 1870. He left no children, but a widow, Mary D. Fair, who was the sole devisee and executrix of his will. In July, 1871, the said executrix filed her complaint, *Mary D. Fair, as executrix,* v. *Jacob Geiger et al.,* to sell the land and marshal the assets of her testator. In this proceeding creditors were called in to prove their demands and were enjoined from suing at law. Among the claims proved was one of Sarah J. Brazel, a sealed note for $800, bearing date October 29, 1869. The property stated by the executrix to belong to the estate was all fully administered under the orders of the court; but the lot and brick building in which the testator died and his widow continued to live, near the Central Bank, and lying on Plain street, Columbia, was not included as a part of the estate of the testator, but was held and occupied by Mrs. Fair as a part of her trust estate for life, with remainder over to the children of her deceased sister.

In April or May, 1885, more than thirteen years after Mrs. Fair had filed her creditors' complaint, as stated, the creditor, Sarah J. Brazel, who had, as before stated, established her de-

mand against the estate, filed her complaint, with leave of the court for that purpose first had and obtained, against Mary D. Fair, as executrix, and the children of Elizabeth A. Marshall, deceased, to subject to the debts of the testator, Dr. Fair, the said house and lot in which Mrs. Fair lived, alleging that the same was, at the time of his death, a part of his individual estate, and subject to the claims of his creditors. The defendants, Mrs. Fair and her nephews, the children of her deceased sister, Mrs. Marshall, made earnest defence on several grounds, to which more particular reference will be made hereafter. It was referred to the master to take the testimony, and the following is a mere outline of the case made :

In the year 1842 the testator intermarried with Mary D., one of the daughters of Jesse DeBruhl, of the city of Columbia, and soon after Mr. DeBruhl purchased for his said daughter a lot situate in the city of Columbia, on Plain street, and near where the Central National Bank now stands. There was at that time a wooden building on the lot, which was at once occupied by Dr. Fair and his wife. It did not clearly appear, but it is believed the title was made directly to Dr. Fair, and he claimed it as his own.

In January, 1853, Jesse DeBruhl, having two married daughters, viz., Mrs. Fair and her sister, Elizabeth A., wife of Col. J. Foster Marshall, of Abbeville, executed and delivered to said Dr. Fair and Col. Marshall, the husbands of his daughters, a deed of trust, whereby he conveyed to them a valuable plantation of 1,909 acres on the Congaree River, near Columbia, and one hundred negro slaves by name, to be held by them "as joint tenants in common," in trust for the sole benefit, use, and behoof of the said Mary D. Fair and the children to be born of her body, and of the said Elizabeth A. Marshall and the children born, or to be born, of her body," &c., the net profits to be equally divided between said trustees for the use of their respective wives, with the power to sell and reinvest," &c., &c. This deed was duly proved and recorded. In December, 1853, the trustees sold and conveyed the plantation to John Bauskett for $28,010, payable in bonds, of which one-half were not due until after 1856. In January, 1854, the trustees seemed to have had a partition of

the trust property, in which Col. Marshall received ninety-four (94) negro slaves at the valuation of $56,200, and Dr. Fair took two of the slaves at $1,400, and the Bauskett bonds, making $29,410, and leaving a difference still due him, as stated, of $12,395 (afterwards enlarged by Chancellor Carroll to $13,395), and Dr. Fair acknowledged the receipt of $29,410 by him as trustee for his wife, Mary D., according to the terms of the above mentioned DeBruhl deed.   (See papers in Brief.)

About the time of this division of the trust estate Dr. Fair placed on the lot whereon he lived, as before stated, valuable permanent improvements in the form of eight tenement buildings, afterwards known as "Fair's Row," and, as alleged, in doing so he expended about $24,000 of the trust money realized from the Bauskett bonds.   In 1863 he applied to his legal adviser, Joseph Daniel Pope, Esq., for instruction as to how he could make safe this investment of the trust funds, and upon the advice thus obtained he executed what in the "Case" is called the "declaration of trust," which recites the DeBruhl deed, the sale thereunder, and the subsequent partition and agreement. It further recites his ownership of the valuable property known as "Fair's Row," and the advisability of substituting said property for the said trust fund of $42,800, and thereby discharging in his hands the said funds of the trusts and limitations of said deed.   It then declares that, in consideration of the premises, and by virtue of the power vested in him by the said DeBruhl deed, the said lot of land, with the buildings thereon, "is held by me in trust under the provisions of the said deed of trust, for the use and benefit of the said Mary D. Fair, subject to the same conditions, limitations, and powers as expressed in the said deed in reference to the other property therein conveyed," with covenant of general warranty, &c.   This deed was not recorded until 1885.   See copy printed in the Brief.

This was during the war, and soon after the "declaration of trust" was executed, all the buildings on the lot were consumed by the fire in which Columbia was burned, and when the war ended there was nothing on the lot where "Fair's Row" had stood, but a mass of ruins.   The slaves which, in the division, had fallen to Col. Marshall, as trustee, for his wife, were emanci-

pated; and Col. Marshall himself had fallen at the battle of Second Manassas, leaving a will, of which Elizabeth A. Marshall, his widow, was executrix, and his brother, J. W. W. Marshall, executor.

In 1866 Fair and wife filed their bill in the then Court of Equity against E. A. Marshall, executrix, and J. W. W. Marshall, executor, making parties defendant also the children of Mrs. Marshall (then all infants, except William J., who was barely of age). This bill recited all the proceedings hereinbefore stated, pointed out the mistake of $1,000 in equalizing the shares, and the $12,395 still due by the estate of Col. Marshall, and prayed "that the mistake may be corrected, and that he be paid $13,395 and interest by the executors of Col. Marshall, and that the declaration of trust may be decreed to be a valid execution of the power conferred *in discharge of the trustee* from all liability for the said sum of $42,805." Merely a formal answer was put in for the minors, but Mrs. Marshall, as executrix, vigorously resisted the claim that the estate of her testator should be made to pay the $13,395 difference in the partition, and declining to assent to the proposition that the ruins of "Fair's Row" should be taken in full satisfaction of the trust fund of $28,010 still left, as she alleged, in the shape of the Bauskett bonds, and praying that Dr. Fair, the trustee, who received those bonds, should be required to give security for the forthcoming of the said funds.

The decree of Chancellor Carroll corrected the error of $1,000, but refused to give judgment against the estate of J. Foster Marshall for the $13,395, and also declined to require Dr. Fair to give security for the amount of the Bauskett bonds, and held that Dr. Fair, trustee, had no right, as a general proposition, or under the DeBruhl deed, to use the trust money in purchasing from himself; and therefore that "*the investment in the lot and buildings referred to could not be sustained. It is voidable at the option of the cestuis que trust.* Mrs. Fair, by reason of her coverture, is incapable of consenting to it, and her sister, the other beneficiary, strongly objects," &c.

Mrs. Marshall died in 1868, leaving several children surviving, remaindermen under the DeBruhl trust and defendants here.

The decree of Chancellor Carroll was never appealed to the Supreme Court. Dr. Fair sold much of the old brick and other material on the place, and with the proceeds, the debris, and the old brick retained, he commenced the erection of the building that now stands upon the lot. Being unable to go on, he completed the building with money borrowed from Mr. J. J. McCarter, the mortgage of McCarter on the premises being paid by a sale of part of the lot as trust property, ordered by the court to be sold, upon petition of the *cestuis que trust.* In 1870 Dr. Fair died, and his childless widow, Mary D. Fair, has been continuously living on the same ever since, electing always to take it, and now claiming it, as the very small remnant of her once large trust estate, and her only home.

The cause was heard on the pleadings and evidence taken by the master, and the Circuit Judge held, substantially, that although the trustee, Fair, may have expended a large amount of the trust fund in making the permanent improvements of Fair's Row, yet he placed them on lands of which the title was in himself, and thereby so mingled the fund with his own property as to preclude the *cestuis que trust* from following it into the lot, and that their only redress was a money accounting against his estate as an ordinary creditor. He also held that the decree of Chancellor Carroll in the case of *Fair and Wife* v. *The executors of J. Foster Marshall et al.*, decided against the validity of the investment in Fair's Row, and in doing so, as he construed its effect, all the questions which the *cestuis que trust* could have made, including that of their election to take under the "declaration of trust," were *res adjudicata*, and they could never afterwards make an election to that effect; that "the court had the right and exercised it of objecting on the part of Mrs. Fair, then a married woman, and on the part of the minors, all of whom were properly before the court;" and holding that the house and lot in question was the individual property of Dr. Fair at his death, ordered it sold for the payment of his debts generally.

From this decree Mrs. Fair, and the children of her deceased sister, Mrs. Marshall, who are the remaindermen under the DeBruhl deed, appeal to this court. The exceptions are numer-

ous and long, and as they are in the Brief, need not be set out here. We think it proper, however, to make the preliminary observation, that this is not an action at law for the recovery *in specie* of the house and lot. A mere creditor has no legal title to the property of his debtor, whether living or dead. His only right, when the debtor is dead, is to sue his personal representative to judgment, and to go into equity to subject what is ascertained to be his property, to the payment of his debts. We do not see that there was any necessity for this separate action, and we will consider the questions made as if they had arisen in the orderly progress of the cause of *Mary D. Fair, as executrix,* v. *Geiger et al.,* to marshal the assets of the estate of Dr. Fair. Being a case in chancery, this court is required to review the findings of fact as well as the rulings of law in the Circuit Court.

In order to prevent confusion, let us consider how the matter would stand, leaving out, for the moment, the record in the case of *Fair and Wife* v. *The executors of Marshall et al.* (1866). One of the exceptions complains that "his honor should have decided (what he left undecided) that the trust funds derived from the trust estate were by the trustee put into the buildings erected on the lot known as Fair's Row; and having so decided, he should have held, as matter of law, that thereafter the buildings became part and parcel of the freehold, not severable therefrom; and having thus held, he should have further held, as matter of law, that the subsequent destruction of the buildings neither changed the nature of the estate thus created, nor the equities of the *cestuis que trust.*"

The Circuit Judge did not, in terms, decide, but he seemed rather to accept as a fact, that Dr. Fair used $20,000 or $24,000 of the trust money in building Fair's Row. We agree with him in that. We have read the testimony carefully. Mrs. Fair so stated most positively, and Dr. Fair so stated in terms to Mr. Pope when he drew the "declaration of trust." It is true that Mr. Pope was then the legal adviser of Dr. Fair, and certain confidential communications to a lawyer are not to be disclosed. But Mr. Pope, a gentleman of the highest character, was made a witness to the paper, and as such he had the right to speak at

least as to its consideration. *Moffatt* v. *Hardin*, 22 *S. C.*, 11.
But without turning aside now to go into that, we think ample
confirmation of the fact is found in the time at which the improve-
ments were made, the want of proof or probability that Dr. Fair
had the necessary means from any other source, his habits of liv-
ing and subsequent conduct, and other circumstances in the case.
We are judicially satisfied of the fact.

We also think the evidence shows that the house now on the
lot was, for the most part, built out of the ruins of Fair's Row,
and a sale of part of the lot itself ordered by the court as trust
property. It was not shown that, immediately after the war, Dr.
Fair had the means to build it, and if he did contribute any
of his own means, it did not appear, or how much. We regard
the house now on the lot as a reproduction and remnant of Fair's
Row, as if it were one of the original eight tenement buildings
of that row, which, in some way, had escaped the destruction
which overwhelmed all the others.

In this state of facts what would be the equities of the *cestuis
que trust ?* "When trustees purchase property with trust funds,
and take the title thereto in their own names, without any decla-
ration of trust, the trust arises in respect to such property in
favor of the *cestui que trust*, or other beneficiary. Equity
regards such a purchase as made in trust for the person bene-
ficially interested." 3 *Pom. Eq. Jur.*, § 1049. If Dr. Fair
had purchased Fair's Row entirely with trust funds, we suppose
there is no doubt the court would declare that a trust had attached
to it, and the *cestuis que trust* would have the option to take it.

But it is said that Dr. Fair owned the lot upon which the im-
provements were made, and he may have contributed some of his
own means in making them, which makes this a case of a trustee
mixing trust funds with his own, and the money in that way
having lost its identity could not be followed; and this on the
authority of *McNeil* v. *Morrow, Rich. Eq. Cas.*, 175. We do
not think the case cited goes so far. It holds the undoubted
doctrine that "so long as property held in trust or a trust fund
can be traced and distinguished, it will enure to the benefit of
the *cestui que trust*, and all claims of the creditors of the trustee
must be postponed until the trust is discharged." But that case

does not undertake to determine when the trust funds cannot be "traced or distinguished." The rule contended for would certainly tend to make the way plain and easy for an insolvent trustee to put the trust funds beyond reach, and thus practically escape all responsibility. The trustee violates his duty when he mixes trust funds with his own, and if he does so, "the burden of proof rests upon him of showing most conclusively what portion is his, and whatever of the mixed fund he cannot thus show to be his own, even though it be the whole mass, will be awarded to the beneficiary." 2 *Pom. Eq. Jur.,* § 1076.

The equitable doctrine applicable to trustees who mix trust funds with their own, is somewhat refined, but, as we understand it, seems to be well stated by Jessel, M. R., in the case of *Knatchbull* v. *Hallett*, 13 *Ch. Div.,* 696, as follows: "The moment you establish the fiduciary relation, the modern rules of equity, as regards following trust money, apply. * * * The doctrines are progressive, refined, and improved, and if we want to know what the rules of equity are, we must look rather to the more modern than the more ancient cases. * * * The modern doctrine of equity, as regards property disposed of by persons in a fiduciary position, is a very clear and well established doctrine. You can, if the sale was rightful, take the proceeds of sale if you can identify them. If the sale is wrongful, you can still take the proceeds of sale in a sense of adopting the sale for the purpose of taking the proceeds if you can identify them. But it often happens that you cannot identify the proceeds. The proceeds may have been invested together with money belonging to the person in a fiduciary position in a purchase. He may have bought land with it, for instance, or he may have bought chattels with it. Now, what is the position of the beneficial owner? In that case, according to the now well established doctrine of equity, the beneficial owner has the right to elect either to take the property or to hold it as a security for the amount of the trust money laid out in the purchase; or, as we generally express it, he is entitled to his election, either to take the property or to have a charge on the property for the amount of the trust money," &c.

This view, as it seems to us, is corroborated and fortified by

the "declaration of trust" in 1863. We do not see how the doctrine that a trustee cannot purchase from himself can be made to apply to this case, in which the question is, not as to the regularity or legality of the investment, but as to the rights of the beneficiaries to claim under a deed made to secure an investment which was "unauthorized." "When the trust is not created by the instrument of conveyance, it may be sufficiently declared and evidenced by the trustee to whom the land is conveyed, or who becomes holder of the legal title, and this may be done by a writing executed simultaneously with, or subsequent to, the conveyance, and such writing may be of a most informal nature." 2 *Pom. Eq. Jur.*, 1007, and notes. Dr. Fair had put $20,000 of trust funds into Fair's Row, but the title of the lot on which it stood was in himself. Could he not dedicate, substitute that property, lands, and houses, as the trust property of his wife, and especially in view of the fact that he had put her trust funds into it? He certainly owed the money, and it was most natural and creditable, if not his duty, to do so. It was very little more than confessing a judgment to secure it, or giving a purchase money mortgage. It is most true, as Chancellor Carroll held, that the investment was "unauthorized," and did not bind the *cestuis que trust*, if they preferred to retain their right to have a money account against the trustee. But the trustee himself could not disclaim it; and if (the trustee being insolvent and not personally able to pay) the beneficiaries chose to take under it, and in that view adopting the investment, why should they not have the right to do so, and hold it as their trust estate?

It is, however, earnestly urged in opposition to this view, that in the case of *Fair and wife* v. *Elizabeth A. Marshall and J. W. W. Marshall, as executors of J. F. Marshall, et al.,* the court refused to confirm the investment, holding that "the investment in the lot and buildings could not be maintained," and Mrs. Fair and the other defendants, having been before the court in that case, are bound by the judgment, and, as a consequence, the right of election which they had before was adjudged against them, and is irrevocably gone. The judgment in that case certainly determined conclusively everything that was properly in issue before the court and decided by it. But the precise points decided must

be determined by the pleadings and scope of the bill and the decree. The bill of Dr. Fair claimed that in the partition of the trust property there was a mistake against him of $1,000, and that there was still due him $12,395, which, by correcting the mistake, was $13,395. To recover this, he instituted the proceeding against the executors of J. F. Marshall, and in order to make that expected recovery his own individual property, he prayed the court to confirm the "declaration of trust," *substituting* Fair's Row in full payment and discharge of *the whole trust fund in his hands*. No mention whatever was made of the right of option or election, but all the questions were made *strictissimi juris*. Mrs. Fair was co-plaintiff with her husband, and the minors made formal answer, submitting their rights. It was not alleged that Dr. Fair was insolvent, and no reference was asked for to ascertain the facts. Indeed, it did not appear that Mrs. Marshall even knew that the proceeds of the Bauskett bonds had been expended in the buildings on Fair's Row, which was then in ruins. The negro slaves, which had been assigned to her husband, were all emancipated, and she very naturally, as his executrix, made vigorous opposition to the recovery claimed against her of $13,395, and all the proceedings on which the claim was founded.

Chancellor Carroll held that Dr. Fair had no right, as a general proposition or under the DeBruhl deed, to use the trust money in purchasing from himself, and, therefore, that "the investment in the lot and buildings referred to could not be sustained. *It is voidable at the option of the cestuis que trust.* Mrs. Fair, by reason of her coverture, is incapable of consenting to it, and her sister, the other beneficiary, strongly objects," &c. The chancellor was right on all the points. After holding that the investment could not be "sustained" as in full discharge of the trustee, he held that it was voidable at the option of the *cestuis que trust*, and he abstained from confirming it, *because* Mrs. Fair, by reason of her coverture, was incapable of consenting to it, and her sister, Mrs. Marshall, who was only interested in remainder, objected.

We are unable to see how this can be construed into an adjudication, deciding and concluding negatively Mrs. Fair's right of option. It seems to us rather as a refusal to determine the matter

of her election on account of her disability, leaving her to make it afterwards, if her disability should be removed. The judgment was, and is, binding on the parties as to the questions of the right of the trustee to make the investment and to recover the $13,395. But we do not consider that the question as to the right of election was before the court, or was necessarily involved in the issues, or actually adjudged. The decree cannot be construed, against its own terms, to have adjudged adversely Mrs. Fair's right of option to take what was left of the investment, although it was made without authority. If it had turned out as Dr. Fair insisted, that he had the power to make the investment, there would have been no need of option on the part of the beneficiaries, for Fair's Row would have been the trust estate with or without their consent. The occasion for option never arose until the decision was made that the investment was "unauthorized."

The familiar doctrine of election is, that "when one is put to his election he is not bound to elect until all the circumstances necessary to enable him to make a deliberate and discriminating choice are ascertained, and it seems if he makes an election without it, he is not bound by it." *Pinckney* v. *Pinckney*, 2 *Rich. Eq.*, 219; 2 *Story Eq.*, §§ 1097, 1098. But even if it should be held that Mrs. Marshall, who was only one of the remaindermen as to this trust of her sister, Mrs. Fair, and is now dead, must be considered to have elected against the investment, we cannot see how in a case like this that should bind all the other parties. See 1 *Pom. Eq. Jur.*, § 516, and notes.

If it was intended to reach beyond the questions made as to the legal right of the trustee to make the investment and to recover the $13,395, we think it was error to hold that "the court had a right and exercised it, of objecting on the part of Mrs. Fair, then a married woman, and on the part of the minors, all of whom were before the court." These parties at that time could not, on account of disability, make an election or option for themselves, and, as we have seen, Chancellor Carroll did not make an election for them, but distinctly disclaimed doing so. The election of Mrs. Fair at that time was in no way necessary to the decree rendered by Chancellor Carroll; and we assume that if he had considered himself as having the right, he could not,

without great necessity, have undertaken to make an election for her and her minor nieces and nephews in reference to a matter of vital consequence to them, and as to which he had no information whatever. See 1 *Pomeroy*, § 509.

It has always been the just boast of equity that it protects those who cannot protect themselves, and that it delights especially in guarding with watchful care the rights of infants and married women. We do not think that Mrs. Fair has ever elected, either in person or through the chancellor, or by the force of the judgment of the court, to repudiate her husband's declaration of trust; but, on the contrary, has always and under all circumstances, before his death and after, by deed as well as by word, claimed to hold under that deed; and that, having now expressed her option to take the house and lot in which she lives as the small remnant of her once handsome trust estate, she has a right to do so, holding it as trustee for the remaindermen, in accordance with the terms of the DeBruhl deed and the declaration of trust of 1863.

This makes it unnecessary to consider the other defence of *laches* and the statute of limitations.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and the complaint dismissed.